UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
OSCAR REMACHE and WASHINGTON CONDOR,
*Individually and on behalf of those similarly situated*,

                                         Plaintiffs,

                  -against-

MAC HUDSON GROUP, MAC HUDSON
CONSTRUCTION CORP., MAC HUDSON
INDUSTRIES CORP., RJB CONTRACTING CORP.,
RJB CONTRACTING CARTING CORP., ARMTECK
AND ASSOCIATIONS CORP., RJB DEMOLITION
CORP., PETER NEODFIDES, ANGELO MARKATOS
*and/or any related entities*, and ARMTEC SERVICES INC.,

                                     Defendants.
------------------------------------------------------------------------X

REPORT AND
RECOMMENDATION
14 CV 3118 (AMD)(RML)

LEVY, United States Magistrate Judge:

                      By order dated February 8, 2018, the Honorable Ann M. Donnelly, United States

District Judge, referred plaintiffs' motion for default judgment to me for a report and

recommendation.  For the reasons stated below, I respectfully recommend that plaintiffs' motion be

granted with respect to the nine plaintiffs who testified at the inquest hearing, but denied as to those

who did not testify.

**BACKGROUND AND FACTS**

                      Plaintiffs Oscar Remache and Washington Condor ("named plaintiffs") commenced

this wage and hour collective and class action on May 19, 2014 against defendants Mac Hudson

Group, Mac Hudson Construction Corp., Mac Hudson Industries Corp., RJB Contracting Corp., RJB

Contracting Carting Corp., Armteck And Associations Corp., RJB Demolition Corp., Peter

Neodfides ("Neodfides"), Angelo Markatos ("Markatos") and/or any related entities, and Armtec

Services Inc., asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et

seq., and the New York Labor Law ("NYLL").  (See Complaint, filed May 19, 2014 ("Compl."),

Dkt. No. 1.)  All defendants initially appeared, answered, and defended this action through one

attorney, Joshua S. Androphy, Esq., and began discovery.  (See Notice of Appearance, dated Nov.

11, 2014, Dkt. No. 19; Answer to Amended Complaint by All Defendants, dated Nov. 17, 2014, Dkt.

No. 21.)  Defendants also consented to conditional certification of a collective action under 29 U.S.C.

§ 216(b).  (See Minute Entry, dated Dec. 9, 2014.)

On April 13, 2015, however, Mr. Androphy moved to withdraw as counsel for

defendants Mac Hudson Group, Mac Hudson Construction Corp., Mac Hudson Industries Corp., and

Neodfides (hereafter the "Mac Hudson defendants" collectively including Mr. Neodfides, or the

"Mac Hudson corporate defendants" with respect to the corporate entities), citing all defendants'

belief that "it is in all parties['] best interests for these two groups of Defendants to have separate

legal representation."  (Motion for Leave to Withdraw, dated Apr. 13, 2015, Dkt. No. 24.)  The

Honorable Roslynn R. Mauskopf, United States District Judge, granted that motion.[1]  (Order, dated

Apr. 16, 2015, Dkt. No. 30.)  At a subsequent status conference, I gave the Mac Hudson corporate

defendants until July 20, 2015 to obtain new counsel, advising them that corporations could not

represent themselves in federal court.  (See Minute Entry, dated June 4, 2015.)  I also ordered Mr.

Neodfides to obtain counsel by that date or be prepared to proceed pro se.  (Id.)  None of the Mac

Hudson defendants complied with these orders.  (See Minute Entries, dated Sept. 22, 2015 and Nov.

24, 2015.)  Accordingly, plaintiffs moved for entries of default pursuant to Federal Rule of Civil

Procedure 55(a).  (See Request for Certificate of Default, dated Feb. 2, 2016, Dkt. No. 11.)   On

February 8, 2016, the Clerk of the Court entered the default of the Mac Hudson defendants.  (See

Certificate of Default, dated Feb. 8, 2016, Dkt. No. 53.)

After that, the non-defaulting defendants and the named plaintiffs, who were now

joined by twenty-six additional opt-in plaintiffs (collectively, "plaintiffs") entered into a period of

---

[1] The case was reassigned to Judge Donnelly on November 18, 2015.

2

targeted discovery and settlement negotiations.  (See Minute Entries, dated Mar. 15, 2016, May 12, 2016, June 6, 2016, and Oct. 11, 2016.)  At the non-defaulting defendants' and plaintiffs' request, the court then referred the parties to the Eastern District of New York's court-annexed mediation program.  (See Order Referring Case to Mediation, dated Oct. 19, 2016.)  Mediation resulted in a settlement between plaintiffs and the non-defaulting defendants in the amount of $125,000, with plaintiffs receiving $83,333 and their attorneys receiving $41,667 in attorney's fees and costs.  (See Motion for Settlement Approval, dated May 8, 2017, Dkt. No. 69.)  Plaintiffs and the non-defaulting defendants consented to my jurisdiction for the limited purpose of deciding the motion for settlement approval.  (Consent to Magistrate Judge Disposition on Motion, dated May 12, 2017, Dkt. No. 72.)  I reviewed and approved the agreement on May 12, 2017, finding it fair and reasonable under the factors set forth in Cheeks v. Freeport Pancake House, 796 F.3d 199 (2d Cir. 2015).  (Order Granting Motion for Settlement, dated May 12, 2017.)

On August 24, 2017, after a period of inactivity, I ordered plaintiffs to show cause why this case should not be closed as they had not moved for default judgment against the Mac Hudson defendants for more than three months following the settlement with the non-defaulting defendants.  Plaintiffs moved for an extension of time to file that motion, indicating that they were unable to finish briefing the motion, including by gathering all the necessary supporting affidavits, as there had also been delays in the non-defaulting defendants' payment of funds; plaintiffs' counsel was hoping to have the clients prepare sworn affidavits at the same time as they picked up their final settlement checks from counsel's office.  (See Letter Motion, dated Sept. 11, 2017, Dkt. No. 75.)  I granted plaintiffs' extension request, as well as a subsequent request.  (See Orders, dated Sept. 12, 2017 and Nov. 30, 2017.)

Plaintiffs ultimately filed their motion for default judgment against the Mac Hudson defendants on December 14, 2017.  (Notice of Motion for Default Judgment, dated Dec. 14, 2017 ("Pls.' Mot."), Dkt. No. 81.)  Only eighteen plaintiffs, however, chose to submit declarations in

support of the motion.  (See Declaration of Laura R. Reznick, Esq. in Support of Motion for Default, dated Dec. 14, 2017 ("Reznick Decl."), annexed as Ex. 23 to Pls.' Mot., Dkt. No. 81-23, ¶ 38.)  Thus, plaintiffs only request that damages be awarded to eighteen plaintiffs: Oscar Remache, Washington Condor, Ramel Towles, Walter Cepeda, Kareem Ransom, Fabian Saravia, Manuel Aguilar, Luis Aguilar, Freddy Alvarez, Cesar Guerrero, Christian Buestan, Edison Astudillo, Eli Samuel Cruz, Federico Escalona, Jorge Cobos Mendieta, Joshua Rivera, Juan Martinez, and Omar Noboa.  (See Summary of All Damages, filed Dec. 14, 2017 ("Damages Summ."), annexed as Ex. 2 to Pls.' Mot., Dkt. No. 81-2.)  Judge Donnelly referred plaintiffs' motion to me on February 8, 2018.  (Order, dated Feb. 8, 2018.)

I held a lengthy inquest hearing on March 29, 2018.  (See Transcript of Hearing, dated Mar. 29, 2018 ("Tr."), Dkt. No. 85.)  Nine plaintiffs testified: the two named plaintiffs (Oscar Remache and Washington Condor) and seven opt-in plaintiffs (Ramel Towles, Walter Cepeda, Kareem Ransom, Fabian Saravia, Manuel Aguilar, Luis Aguilar, and Freddy Alvarez).  (See id. at 161.)  The other nine plaintiffs who submitted declarations in support of the motion did not appear and were apparently unavailable to testify by telephone.  (See id. at 136; see also Letter Motion, dated Mar. 27, 2018, Dkt. No. 83.)  The non-testifying plaintiffs are: Cesar Guerrero, Christian Buestan, Edison Astudillo, Eli Samuel Cruz, Federico Escalona, Jorge Cobos Mendieta, Joshua Rivera, Juan Martinez, and Omar Noboa.

Both before and during the hearing, plaintiffs' counsel requested that the court consider the testifying plaintiffs' testimony to be "representative testimony" and therefore credit the non-testifying plaintiffs' declarations.  (See Letter Motion, dated Mar. 27, 2018, Dkt. No. 83; Tr. at 156:5–158:21.)  The hearing, however, revealed many inconsistencies between the written declarations and the recollections of the testifying plaintiffs.  I therefore directed plaintiffs to file supplemental submissions in support of the motion to provide the court with more complete documentation of any paystubs or timesheets in plaintiffs' possession—with the understanding that

4

many of these records might not be accurate given multiple plaintiffs' testimony that the hours worked listed on their paystubs did not match their actual hours worked—as well as deposition transcripts, where appropriate.  (Tr. at 120:14–123:19; 159:8–23.)  In response, plaintiffs filed a supplemental submission and attached voluminous exhibits.  (See Supplemental Declaration of Laura R. Reznick, Esq. in Support of Motion for Default, filed Apr. 25, 2018 ("Supp. Reznick Decl."), Dkt. No. 84.)

Plaintiffs assert claims under the FLSA and the NYLL for unpaid overtime wages (Reznick Decl. ¶¶ 14–23) and liquidated damages (id. ¶¶ 24–28).[2]  Plaintiffs also seek recovery under the NYLL for failure to provide proper wage notices, as well as prejudgment and post-judgment interest.  (Id. ¶¶ 24–28.)  Plaintiffs also move for reasonable attorney's fees and costs under both statutes.  (Id. ¶¶ 36–52.)

**DISCUSSION**

**A.  Liability**

A defendant's "default is deemed to constitute a concession of all well pleaded allegations of liability."  Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).  Once a default judgment is entered, the court "is required to accept all of [plaintiff's] factual allegations as true and draw all reasonable inferences in [plaintiff's] favor."  Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir.1981)).  The court must also "determine whether [plaintiff's] allegations establish [defendants'] liability as a matter of law."  Id.

Plaintiffs have sufficiently pleaded factual allegations that give rise to liability for unpaid overtime under the FLSA and the NYLL.  (Compl. ¶¶ 26–42.)  They have also sufficiently

---

[2] I find that jurisdiction is proper based upon 28 U.S.C. § 1331, insofar as it involves a statute of the United States, specifically, the FLSA, 29 U.S.C. §§ 201 et seq., and plaintiffs rely upon 28 U.S.C. § 1367 to invoke supplemental jurisdiction with respect to the state law claims which form another basis for recovery upon the same factual nexus.

5

pleaded that they were not given proper wage statements and wage notices as required by NYLL §
195.  (Id. ¶ 78.)  The extent to which they can recover damages from the defaulting defendants based
upon these violations depends on whether: (1) their claims were timely; (2) they are covered
employees under the FLSA and the NYLL; and (3) defendants were plaintiffs' joint employers under
the FLSA and NYLL.

### 1.  Timeliness

For claims to be timely under the FLSA, plaintiffs' claims must have arisen within
the two years prior to the filing of the complaint, or—for willful violations—within the three years
prior.  29 U.S.C. § 255(a).  Here, plaintiffs have pleaded willful violations of the Act (Compl. ¶ 61),
and defendants have, by virtue of their default, waived the affirmative defense of statute of
limitations.  See Gunawan v. Sake Sushi Rest., 897 F. Supp. 2d 76, 87 (E.D.N.Y. 2012) (citing Day
v. McDonough, 547 U.S. 198, 202 (2006); Davis v. Bryan, 810 F.2d 42, 44 (2d Cir. 1987); Archie v.
Grand Cent. P'ship, 997 F. Supp. 504, 536 (S.D.N.Y. 1998)).  Because all plaintiffs allege that they
were employed by defendants and that overtime violations occurred after May 19, 2011, all plaintiffs
have timely claims under the FLSA.

For claims to be timely under the NYLL, plaintiffs' claims must have arisen within
the six years prior to the filing of the complaint.  See N.Y. LAB. L. §§ 198(3); 663(3).  Because the
plaintiffs allege that they were employed by defendants and that underpayment of overtime, wage
notice violations, and wage statement violations occurred after May 19, 2008, all plaintiffs have
timely claims under the NYLL.

### 2.  Employee Coverage Under FLSA

Because the minimum wage and overtime provisions of the FLSA and the NYLL
apply only to employees of covered employers, plaintiffs in wage and hour actions must show that
they were defendants' employees, and that defendants were employers subject to the coverage of
each statute.  For purposes of the FLSA, an employee is "any individual employed by an employer,"

29 U.S.C. § 203(e)(1), meaning any individual who an employer "suffer[s] or permits to work," 29 U.S.C. § 203(3)(g).  Absent a statutory exemption, such individuals are protected by the FLSA, so long as they work for a covered employer.  An employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  Person is defined as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."  29 U.S.C. § 203(a).  In addition, for employees to be covered by the FLSA's overtime provisions, they must show either that their employer was an enterprise engaged in interstate commerce *or* that their work as employees regularly involved them in interstate commerce.  See 29 U.S.C. § 207(a).

Here, plaintiffs have adequately pleaded that they were employees in the construction field to whom no statutory exemption applied.  (Compl. ¶ 48)  Plaintiffs have  adequately alleged that the defendants individually and collectively met the definition of "employer," insofar as plaintiffs "would regularly report to the same agents and/or supervisors of the Corporate Defendants and receive instructions on which job site to work at and what tasks to perform."  (Id. ¶¶ 43–44.) Plaintiffs also adequately allege that the individual defendants Peter Neodfides and Angelo Markatos were at all times owners and/or managers of the Mac Hudson corporate defendants and the non-defaulting corporate defendants, with, *inter alia*, power to hire and fire plaintiffs, supervise and control plaintiffs' work, and determine the methods and amounts that plaintiffs would be paid.  (Id. ¶ 47.)  These allegations were supported by abundant testimony at the inquest hearing.  (See, e.g., Tr. at 28:5–15; 38:14–39:21; 41:13–15 (identifying Neodfides as owner of Mac Hudson); 65:1–24 (same); 66:1–14 (identifying Neodfides as signer of paychecks for Mac Hudson defendants and the non-defaulting defendants); 82:18–83:8 (explaining that Neodfides was initially in charge of all jobs, but later shifted day-to-day worksite control to Markatos).  Accordingly I find that the Mac Hudson defendants and the non-defaulting defendants were properly named as employers.

With respect to enterprise coverage, plaintiffs allege that defendants individually and collectively had gross receipts of greater than $500,000 per year during the period within the three-year statute of limitations, both individually and in the aggregate, which were engaged in interstate commerce.  (Compl. ¶¶ 22, 49.)  They thus allege that they are covered employees under the FLSA. These allegations are, on their face, conclusory, insofar as they restate the statutory definition of enterprise coverage without providing additional facts.  Multiple courts in this district have held that similarly conclusory allegations of enterprise coverage may be accepted on a motion for default judgment where it may be inferred from the type of business enterprise that it was engaged in interstate commerce.[3]  I agree with courts that have adopted this approach, and therefore find that the enterprise that employed plaintiffs—i.e. a construction business—is a type that is typically involved in interstate commerce.  Plaintiffs have therefore sufficiently established that they are covered employees under the FLSA.

---

[3] See, e.g., Huerta v. Victoria Bakery, No. 10 CV 4754, 2012 WL 1107655, at *1–2 (E.D.N.Y. Mar. 30, 2012) (Dearie, J.) ("[T]he original complaint, the Court concludes, provides a sufficient basis . . . for inferring the requisite interstate commerce connection under the sensible approach adopted by other judges in this district.  The complaint alleges that plaintiffs Huerta and Gonzaga were employed as bread makers in a Brooklyn-based bakery with over half a million dollars in annual sales.  It is inconceivable that some of the bread-making materials used by plaintiffs did not originate out of state or that the bakery did not sell its products outside the State of New York."); Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011) (Seybert, J.) ("Because even local business activities fall within the reach of the FLSA when an enterprise employs workers who handle goods or materials that have moved or been produced in interstate commerce, the test is met if Plaintiffs merely handled supplies or equipment that originated out-of-state . . . . The Court finds it logical to infer here that the cleaning supplies utilized by the Plaintiffs originated outside of New York. Plaintiffs' Complaint, therefore, fairly alleges that the Defendants are an "enterprise engaged in commerce." Consequently, the Court finds that Plaintiffs are covered by the FLSA.") (internal citations and quotation marks omitted); but see Perez v. Queens Boro Yang Cleaner, Inc., No. 14 CV 7310, 2016 WL 1359218, at *4 (E.D.N.Y. Mar. 17, 2016) (Orenstein, J.) ("While some judges in this district disagree, and have granted default judgments notwithstanding a similar lack of specificity in other cases, I conclude that requiring non-conclusory allegations is more consonant with applicable case law concerning pleading requirements, and that it does not frustrate the FLSA's remedial purpose to require a plaintiff seeking the statute's protection to explain in her pleading just what it is about her employer's business that brings it within the law's ambit.") (footnote omitted), report and recommendation adopted sub nom. Perez v. Yang Cleaners, 2016 WL 1337310 (E.D.N.Y. Apr. 5, 2016).

### 3.   Joint Employer Status Under the FLSA

 "The FLSA contemplates that more than one employer may be responsible for violations of the statute." Dixon v. Zabka, No. 11 CV 982, 2014 WL 6084351, at *3 (D. Conn. Nov. 13, 2014) (citing 29 C.F.R. §§ 791.2(a)–(b)).  To determine whether putative joint employers should be deemed to have been plaintiffs' joint employer, courts in the Second Circuit evaluate "'the circumstances of the whole activity,' viewed in light of 'economic reality.'" Zheng v. Liberty Apparel Co., 355 F.3d 61, 71 (2d Cir. 2003) (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947) and Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961), respectively). A joint employment relationship can be found where the court finds that a putative joint employer exercises either formal control or functional control over plaintiffs.  See Barfield v. N.Y.C. Health and Hosps. Corp., 537 F.3d 132, 142–43 (2d Cir. 2008).

To determine formal control, Second Circuit courts consider whether the alleged employer: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984) (quoting Bonnette v. Cal. Health and Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)). "[W]hen an entity exercises those four prerogatives, that entity, in addition to any primary employer, must be considered a joint employer." Zheng, 355 F.3d at 67.  To determine functional control, Second Circuit courts consider a broader set of six factors:

> (1) whether the [putative joint employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the [direct employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to the [putative joint employer]'s process of production; (4) whether responsibility under the contracts could pass from one [direct employer] to another without material changes; (5) the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

9

Dixon, 2014 WL 6084351, at *3 (quoting Zheng, 355 F.3d at 72).  In addition, the court is free to

consider "any other factors it deems relevant to its assessment of the economic realities."  Zheng, 355

F.3d at 72-73.

        Here, plaintiffs have pleaded sufficient allegations to establish that the Mac Hudson

defendants and the non-defaulting defendants were all joint employers, which were well-supported

by testimony at the inquest.  Several plaintiffs testified that defendants shifted the payroll from one

entity to the other.  (See, e.g., Tr. at 65:1–66:14; 70:6–17; 82:9–84:14.)  Plaintiffs also testified that

Neofides remained in charge of the worksites and the employees throughout.  (See, e.g., id. 70:20–

23, 82:18–24.)

        I therefore find it appropriate, in light of defendants' default and this testimony, to

conclude that all of the Mac Hudson corporate defendants and the non-defaulting defendants

exercised functional control over plaintiffs and were therefore plaintiffs' joint employers.  The Mac

Hudson defendants may therefore properly be found to be jointly and severally liable for any

violations of the FLSA that they or the non-defaulting defendants committed.

### 4.  NYLL Employee Coverage and Joint Employer Status

        Courts have repeatedly recognized that the NYLL embodies similar standards as the

FLSA.  In fact, the NYLL is significantly more expansive in its coverage of private employers

insofar as it "does not require that a defendant achieve a certain minimum in annual sales or business

in order to be subject to the law."  Garcia v. Badyna, No. 13 CV 4021, 2014 WL 4728287, at *6

(E.D.N.Y. Sept. 23, 2014) (citing N.Y. LAB. L. § 651(6)).  I therefore find that the plaintiffs are

covered employees for the purposes of the NYLL.

        "Courts hold that the New York Labor Law embodies the same standards for joint

employment as the FLSA."  Chen v. Street Beat Sportswear, Inc., 364 F. Supp. 2d 269, 278

(E.D.N.Y. 2005) (collecting cases); see also Flannigan v. Vulcan Power Grp., 642 F. App'x 46, 52

(2d Cir. 2016) (summary order) ("[A]n entity may be a 'joint employer' under the Labor Law,

depending on 'the circumstances of the whole activity, viewed in light of economic reality.'")
(quoting <u>Zheng</u>, 355 F.3d at 71, and citing <u>Chen</u>, 364 F. Supp. 2d at 278).  I therefore find that
defendants were plaintiffs' joint employers under the NYLL, and thus the Mac Hudson defendants
may be held jointly and severally liable for any violations of the NYLL that they or the non-
defaulting defendants committed.

**B.  <u>Damages</u>**

Once the court has determined that defaulting defendants are liable, "the court must
conduct an inquiry to establish damages to a 'reasonable certainty.'"  <u>Gunawan</u>, 897 F. Supp. 2d at 83
(quoting <u>Credit Lyonnais Sec. (USA), Inc. v. Alcantara</u>, 183 F.3d 151, 155 (2d Cir. 1999).  "[T]he
quantum of damages remains to be established by proof unless the amount is liquidated or susceptible
of mathematical computation."  <u>Flaks v. Koegel</u>, 504 F.2d 702, 707 (2d Cir. 1974).  "The burden is on
the plaintiff to establish its entitlement to recovery."  <u>Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna,
Inc.</u>, 655 F.Supp.2d 177, 189 (E.D.N.Y. 2009).

**1.  Form of Proof Evaluated**

It is well-established that plaintiffs may generally meet their burden to establish their
entitlement to damages through detailed affidavits in lieu of live testimony.  <u>Gunawan</u>, 897 F. Supp.
2d at 83 ("Detailed affidavits and other documentary evidence can suffice in lieu of an evidentiary
hearing.") (citing <u>Credit Lyonnais</u>, 183 F.3d at 155; <u>Action S.A. v. Marc Rich & Co.</u>, 951 F.2d 504,
508 (2d Cir. 1991)).  However, it is plainly within the court's discretion to require more.  <u>See</u> <u>Jemine
v. Dennis</u>, 901 F. Supp. 365, 373–74 (E.D.N.Y. 2012) ("In determining the amount of damages,
the court may require an evidentiary hearing or rely on detailed affidavits or documentary evidence.")
(citations omitted).  It also remains plaintiffs' burden to establish their entitlement to recovery.
Unfortunately for the non-testifying plaintiffs, the testimony of the testifying plaintiffs diverged in
significant ways from the written declarations they submitted to the court.  In light of this, I cannot
conclude that these declarations can be accepted as a credible replacement for live testimony.

11

Therefore, I do not find that plaintiffs have met their burden with respect to the non-testifying plaintiffs.

In the alternative, plaintiffs' counsel argues that the court should treat the live testimony as representative testimony.   It is true that the use of "representative testimony" (or "representational evidence") is a regular practice in FLSA collective actions.  See Reich v. S. New Eng. Telecomms. Corp., 121 F.3d 58, 67 (2d Cir. 1997) ("[T]he Secretary need not present testimony from each underpaid employee; rather, it is well-established that the Secretary may present the testimony of a representative sample of employees as part of his proof of the prima facie case under the FLSA.") (citations omitted).  Such testimony usually requires, however, that the court find that those testifying constitute a representative sample and that reasonable inferences can indeed be made from that testimony.  See Reich, 121 F.3d at 68 ("Our focus is not on the numbers in isolation but on whether the district court could reasonably conclude that there was 'sufficient evidence to show the amount and extent of . . . [uncompensated] work as a matter of just and reasonable inference.'") (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1966)); see also Harold Levinson Assocs. v. Chao, 37 F. App'x 19, 21 (2d Cir. 2002) (summary order) ("The plaintiff needs merely to offer an estimate of damages that is satisfactory as a matter of reasonable inference.  This burden is not high, and a 'representative sample' of employees can provide a foundation for assumptions about the overall employee pool, so long as a representative from each relevant category of employees testifies.").

Generally speaking, the use of representative testimony is best reserved for situations where (1) the "testimony covered each clearly defined category of worker"; (2) there is "actual consistency among those workers' testimony, both within each category and overall"; (3) defendants offer "no contradictory testimony"; (4) "the abuse arose from an admitted policy of the employer that was consistently applied"; and (5) the time periods for which pay is at issue "are predictable, daily-recurring periods of uniform and predetermined duration."  Reich, 121 F.3d at 68.

12

Here, the testimony established that defendants employed a number of different methods—no fewer than six, according to plaintiffs' counsel—to evade their obligations under wage and hour laws. The testimony suggested, therefore, no particular policy that was consistently applied; even though all workers allege defendants cheated them of overtime pay, they allege different methods through which they did so. There is, moreover, very little consistency among the workers' testimony, as will become clear in the summary of the testifying plaintiffs' damages below, such that it could reasonably be inferred that all non-testifying plaintiffs worked a roughly similar schedule. Given all of this, as well as the stark divergences[4] between the declarations and the live testimony at the inquest, I cannot draw any reasonable inferences such that the testifying plaintiffs' testimony could be fairly considered to be "representative" of the non-testifying plaintiffs' damages. See Harold Levinson, 37 F. App'x at 21– 22 ("The time-clock records demonstrate that hours tended to fluctuate from one week to the next. Given this reality and given that many of the derived PCX hours are based on departmental rather than individual averages, we find that actual hours worked by each individual employee for each specific PCX week cannot be derived as a matter of reasonable inference.")

I therefore recommend that damages for unpaid overtime be denied as to the non-testifying plaintiffs, but without prejudice. If those plaintiffs were able to arrange for live testimony before the court, a motion for default judgment with respect to them could be brought again, and their damages award properly determined.

---

[4] These differences are not limited to recollections of wages and hours alone. For example, while plaintiff Washington Condor testified that he worked as a carpenter throughout his employment, his declaration stated that he worked as a foreman, laborer, and construction worker throughout his employment, and made no mention of his work as a carpenter. See infra at § 4(a). I point this out not because these are mutually exclusive descriptions (they are not) but rather to observe that even if I *could* find an employee representative of a certain job category (i.e., that Condor was representative of carpenters), I would be extremely hard-pressed to rely on the declarations' statements of the non-testifying plaintiffs' occupations. Extrapolating in this way would require me to pretend as though I had not seen and heard the stark differences between the live testimony and the declarations. That would be unjust both to the defaulting defendants and to the non-testifying plaintiffs, for as will become clear below, the live testimony has in some cases yielded higher damages awards than plaintiffs initially requested.

### 2.  Prior Settlement

As previously mentioned, plaintiffs have already received settlement payments from

the non-defaulting defendants in partial satisfaction of the damages owed to them.  (See Individual

Allocation Amounts, annexed as Ex. B. to Motion for Settlement, Dkt. No. 69-2.)  All defendants are

jointly and severally liable for plaintiffs' unpaid overtime and other damages, but this does not mean

that plaintiffs are permitted to make a double recovery.  Accordingly, I find that any amounts owing

to plaintiffs must be reduced by the damages they received in the settlement with the non-defaulting

defendants.

### 3. Hours Worked

"As a preliminary matter, when an employer fails to maintain accurate records or

where, as here, no records have been produced as a consequence of a defendant's default, courts have

held that the "'plaintiff['s] recollection and estimates of hours worked are presumed to be correct.'"

Gunawan, 897 F. Supp. 2d at 88 (quoting Zeng Liu v. Jen Chu Fashion Corp., No. 00 CV 4221, 2004

WL 33412, at *3 (S.D.N.Y. Jan. 7, 2004)); see also Kim v. Kum Gang, Inc., No. 12 CV 6344, 2015

WL 2222438, at *25 (S.D.N.Y. Mar. 19, 2015) (where an employer fails to maintain records of wages

and hours, plaintiffs "need only prove that they performed work for which they were not properly

compensated and produce sufficient evidence to show the amount and extent of that work as a matter

of just and reasonable inference") (internal quotation marks and citations omitted); Hart v. Rick's

Cabaret Int'l, Inc., 60 F. Supp. 3d 447, 466 (S.D.N.Y. 2014) ("It would be manifestly unfair to allow

employers to avoid, or reduce, their liability simply because they kept shoddy records.").

Here, because the Mac Hudson defendants have defaulted and no employment

records have been produced by those defendants, the court will presume plaintiffs' recollection and

estimates of hours worked—as stated in their testimony at the inquest—to be accurate. Accordingly, I

generally will adopt those estimates in calculating the wages they are owed below.  The court notes,

however, that this testimony occurred nearly four years after the complaint was filed.  In many cases,

14

the period of employment about which plaintiffs testified was anywhere from six to nine years prior to the inquest.  Thus, where necessary, I will also turn to other documentary evidence to supplement gaps in plaintiffs' testimony.

### 4. Unpaid Overtime Compensation

Plaintiffs are entitled to overtime compensation under both the FLSA and NYLL at the rate of one and one-half times their regular rate of pay for the hours they worked in excess of forty during a workweek.  See 29 U.S.C. § 207(a)(1); N.Y. COMP. CODES R. & REGS. tit. 12,  § 142-2.2.  In determining the regular rate of pay, plaintiffs argue that the testifying plaintiffs' testimony supports the conclusion that the time stubs they have submitted "are likely an accurate reflection of the hourly rate Plaintiffs were paid, but do not accurately reflect the hours they worked or their dates of employment."  (See Supp. Reznick Decl. ¶ 6.)  I agree that the plaintiffs' testimony at the inquest supports this conclusion.  I therefore will draw on those paystubs, and plaintiffs' testimony, in calculating the overtime plaintiffs are owed below.

#### a. Washington Condor

Named plaintiff Washington Condor ("Condor") was hired sometime in September 2009.  (See Tr. at 86:12–18; Compl. ¶ 35.)  For computational purposes, the court will select a date at the beginning of the second full week of the month—September 14, 2009—as his start date.  His starting hourly rate was $18.  (Tr. at 85:4–7.)  According to his testimony, for the entire period of his employment, Condor worked as a carpenter.  (Id. at 87:18–88:6.)  His declaration, however, states that he was employed as a foreman, laborer, and construction worker, and makes no specific reference to carpentry.  (Declaration of Washington Condor, dated Oct. 20, 2017 ("Condor Decl."), annexed as Ex. 3 to Pls.' Mot., Dkt. No. 81-3, ¶ 2.)

Condor's hourly rate appears to have increased several times over the course of his employment: to $20 in the pay period starting January 16, 2012, to $22 on November 19, 2012, and to $25 on October 2, 2013.  (See Documentation of Damages for Named Plaintiff Washington

Condor, annexed as Ex. 3 to Supp. Reznick. Decl. ("Condor Docs."), Dkt. No. 84-1, at 141, 181, 301.)  Condor also testified that his rate increased to $23 or $24 at some point, but it is unclear when exactly this occurred, and the paystubs submitted do not reflect that increase.  (See id.; Tr. at 87:1–11.)  Condor testified that his employment terminated at the end of February 2014.  (Tr. at 87:12–17.)  This is consistent with the paystubs submitted by plaintiffs, which suggest that his last day of employment was February 18, 2014.  (See Condor Docs. at 350.)

Condor testified that he typically worked six days a week: Monday through Friday, 7:00 a.m. to 5:30 p.m., and Saturday, 7:30 a.m. to 3:30 p.m. or 8:30 a.m. to 4:30 p.m.  (Tr. at 88:17–21.)  Condor also testified, however, that his work day sometimes started later—i.e. at 7:30 or 8:30 a.m.—depending on the distance he needed to travel to the worksite; he did not, however, indicate how frequently this occurred.  (Id.)  He also testified that he worked occasionally on Sundays if emergency work was needed, but offered no recollection of hours worked on those days.  (Id. at 88:22–25.)  While Condor was not asked whether he received a half-hour lunch break, other testifying plaintiffs stated that they did.  Based on his testimony as to his schedule, I find that Condor was owed compensation for between 51 (using the estimate of an 8:30 a.m. start time) and 58.5 hours per week (using the estimate of a 7:00 a.m. start time).  I will, however, note that his declaration stated that he sometimes worked as few as 48 hours per week.  (Condor Decl. ¶ 8.)

Condor testified that when he began his employment, his paystubs reflected all of his hours, but that they paid all hours over forty at the regular rate.  (Tr. at 89:18–20; 90:3–6.)  At some point, he says his paystubs started to reflect 40 hours, but that overtime hours were paid in cash at an hourly rate of $2 less than the regular rate (id. at 90:10–21); Condor explained that defendants claimed they were simply making a deduction of $2 an hour in lieu of proper payroll deductions.  (Id.)  Finally, there was another period in which Condor states that his paystubs reflected hours being paid at time and a half, but that defendants shaved off approximately half those overtime hours and did not pay him for those hours; as he explained it, "if we worked 50 or 55 hours per

16

week, the check showed 40 hours at the same rate and five, six, seven hours at the rate of time and a half but we had actually [worked] 55 hours." (Id. at 90:22–91:6.)

The paystubs plaintiffs have submitted, however, do not neatly line up with Condor's testimony. Some of the paystubs actually begin to reflect overtime being paid starting with the pay period beginning July 4, 2011. (Condor Docs. at 119.) Generally, though, the number of hours listed on the paystubs varies wildly, including numbers both above and below forty (see id. at 102–18). There are no paystubs at all prior to 2011 in the submissions before the court. And Condor is right that most of the stubs prior to October 31, 2011 reflect all time being paid at the regular rate, save for a few exceptions, such as the period from July 4, 2011 to July 17, 2011 and the period from August 1, 2011 to September 4, 2011. (See id. at 102–23.) But, given Condor's testimony that the paystubs listing over 40 hours in this period reflect all of his hours, those paystubs seem to contradict his claim of hours worked insofar as the hours range widely between forty and fifty.

There is then a consistent period in which the paystubs reflect forty hours or less— sometimes as few as eight hours—beginning with the pay period starting on October 31, 2011. (See id. at 135–60.) This would seem to correspond to Condor's claim of a period in which defendants paid Condor's overtime in cash at the regular rate minus $2. And then, as of the pay period starting June 18, 2012, overtime hours begin to be reflected on the paystubs. (See id. at 161.)

The inconsistencies between the paystubs and the testimony do raise concerns for the court. Nevertheless, the Mac Hudson defendants' default, combined with their failure to maintain and produce time records in their possession, requires that I rely on Condor's best recollection and draw all reasonable inferences in Condor's favor. I note, moreover, that I did find Condor's recollection at the hearing generally to be credible.

I therefore will take the average of Condor's estimated hours of 51 and 58.5 hours per week and calculate his overtime damages based on an average workweek of 54.75 hours. Based on his testimony and the paystubs, I will assume that he was paid straight time for all hours through

October 30, 2011.  I will therefore calculate his damages for all pay periods prior to that date to be

unpaid half time.  I will then assume that he was paid the regular rate minus $2 for all his overtime

hours from October 31, 2011 through June 17, 2012.  Finally, I will assume that he was shorted

roughly half his overtime hours from June 18, 2012 onward; I will therefore assume that he was

owed 7.375 hours of unpaid overtime per week for that period (i.e., half of his average 14.75 hours

of overtime).  Using all these assumptions, I calculate Condor's damages for unpaid overtime to be

$42,008, broken down[5] as follows:

| Period | Weeks | Rate | Hours OT paid at RR per week | Hours OT paid at RR minus $2 per week | Hours OT not paid per week | OT owed |
|---|---|---|---|---|---|---|
| 9/14/2009 - 10/30/2011 | 111 | $18 | 14.75 | n/a | n/a | $14,735.25 |
| 10/31/2011 - 1/15/2012 | 11 | $18 | | 14.75 | | $1,784.75 |
| 1/16/2012 - 6/17/2012 | 22 | $20 | | 14.75 | - | $3,894.00 |
| 6/18/2012 - 11/18/2012 | 22 | $20 | - | | 7.375 | $4,868 |
| 11/19/2012 - 10/1/2013 | 46 | $22 | - | | 7.375 | $11,195 |
| 10/2/2013 - 2/18/2014 | 20 | $25 | - | | 7.375 | $5,531 |
| | | | | | **TOTAL** | **$42,008.00** |

### b. Oscar Remache

Named plaintiff Oscar Remache ("Remache") was hired sometime in June 2010.

(See Tr. at 41:16–43:8; Compl. ¶ 28.)  For computational purposes, the court will select a date at the

beginning of the second full week of the month—June 14, 2010—as his start date.  His starting

hourly rate was $15.  (Tr. at 43:18–20.)  For the entire period of his employment, Remache

performed construction work during the day and demolition work at night.  (Id. at 46:20–22.)

Remache's hourly rate increased several times over the course of his employment.  Paystubs

provided by plaintiffs indicate that his hourly rate stayed $15 until February 27, 2013, when it

---

[5] In the table below and in all subsequent tables summarizing unpaid overtime, certain terms are abbreviated as follows: overtime ("OT") and regular rate ("RR").

increased to $17.  (See Documentation of Damages for Named Plaintiff Oscar Remache, annexed as

Ex. 4 to Supp. Reznick. Decl. ("Remache Docs"), Dkt. No. 84-2, at 12.)  It then increased to $18

starting April 17, 2013, where it appears to have remained until the end of his employment on

February 18, 2014.  (Id. at 13–14.)

        Remache testified that he typically worked all five weekdays each week, Mondays

through Fridays, 7:00 a.m. to 5:00 p.m., and three out of four Saturdays per month, 8:00 a.m. to 4:30

p.m.  (Tr. at 45:9–48:4.)  He testified that he always had a half-hour lunch break.  (Id. at 45:17–20.)

In addition to these hours, once or twice on weekdays, Remache worked until 8:00 p.m. or 9:00 p.m.

(Id. at 47:6–11.)

        Remache also testified that there were four days during the course of his employment

where he worked an additional 6:00 p.m. to 2:00 a.m. night shift, doing demolition work.  (Id. at

45:21–46:22.)  It was unclear from Remache's testimony whether this extra shift resulted in any

change in his daytime schedule, but it seems that it did not; this was, however, not a very frequent

occurrence.  Because I do not know when those extra shifts occurred, I do not have the ability to

calculate damages owed for them.

        Based on this schedule, Remache was owed compensation for an average 56.5 hours

to 61.5 hours, depending on whether he worked three or four extra hours per night once or twice a

week.  For purposes of calculating wages owed, I will estimate his hours worked to be 59 hours per

week.

        Remache testified that he was paid forty hours of his pay by check, but that he was

only paid for approximately half of his overtime hours, at the regular rate.  (Id. at 48:5–51:25.)  He

also testified that when his overtime was paid in cash, two dollars per hour were deducted,

supposedly in lieu of a payroll deduction.  (Id. at 48:22–49:7.)  He did not, however, provide a clear

estimate as to how often he was paid in cash.  I will therefore calculate his overtime damages without

accounting for the two-dollar deduction.  In sum, I calculate Remache's damages for unpaid overtime to be $57,494, broken down as follows:

| Period | Weeks | Rate | Hours OT paid at RR per week | Hours OT not paid per week | OT owed |
|--------|-------|------|------------------------------|-----------------------------|---------|
| 6/14/2010 - 2/26/2013 | 141 | $15 | 9.5 | 9.5 | $40,185.00 |
| 2/27/2013 - 4/16/2013 | 7 | $17 | 9.5 | 9.5 | $2,261.00 |
| 4/17/2013 - 2/18/2014 | 44 | $18 | 9.5 | 9.5 | $15,048.00 |
| | | | | **TOTAL** | **$57,494.00** |

### c. Walter Cepeda

Opt-in plaintiff Walter Cepeda ("Cepeda") first testified that he was hired in the middle of 2010.  (See Tr. at 18:17–25.)  His declaration, however, stated that he was hired in the middle of 2011.  (Declaration of Walter Cepeda, dated Oct. 11, 2017 ("Cepeda Decl."), annexed as Ex. 20 to Pls.' Mot., Dkt. No. 81-20, ¶ 1.)  Asked about this discrepancy, Cepeda clarified that he was not sure which year was correct.  Plaintiffs' supplemental submission uses 2011 as the starting year.  (See Documentation of Damages for Opt-In Plaintiff Walter Cepeda, annexed as Ex. 20 to Supp. Reznick. Decl. ("Cepeda Docs"), Dkt. No. 84-18.)  For computational purposes, the court will select a date in the middle of the year beginning of the second full week of the month—June 13, 2011—as his start date.  His starting hourly rate was $17.  (Tr. at 19:14–19.)  For the entire period of his employment, Cepeda was a fire guard/watchman.  (Id. at 19:3–4; Cepeda Decl. ¶ 2.)  Cepeda's hourly rate increased several times over the course of his employment.  Paystubs provided by plaintiffs indicate that his hourly rate stayed at $17 until March 13, 2013, when it increased to $20; it then went up to $22 on April 10, 2013 and to $26.24 on July 17, 2013.  (See Cepeda Docs at 8–15.)  Additionally, there is a paystub that indicates his rate dropped again to $20 toward the end of his employment (id. at 15). I have accounted for this in my calculations.

Cepeda testified that he typically worked Monday through Friday, 7:00 a.m. to 5:00

p.m., and Saturday, 7:00 a.m. to 3:00 p.m.  (Tr. at 20:13–22:12.)  He testified that he always had a half-hour lunch break.  (Id. at 23:5–14.)  In addition to these hours, Cepeda worked until 11:00 p.m. once a week.  (Id. at 21:2–23.)  He also testified that he worked one or two Sundays per month, 7:00 a.m. to 3:00 p.m.  (Id. at 22:13–23:4.)  Based on this schedule, Cepeda was owed compensation for approximately 63 hours per week, assuming he worked one Sunday per month.[6]

Cepeda testified that he was regularly paid by check for 40 hours of work and in cash for the overtime hours.  (Id. at 23:19–24:18.)  He was unable to give a precise estimate of the rate he was paid for overtime, but he said that about $250 to $300 in cash usually accompanied his check.  (Id. at 31:2–22.)  He also said he was not paid for approximately five hours per week at all.  (Id. at 37:9–15.)  Accordingly, I estimate that he was paid straight time at the regular rate for 18 hours of overtime and was not paid at all for 5 hours of overtime.  I therefore calculate his damages for unpaid overtime to be $49,575.90, broken down as follows:

| Period | Weeks | Rate | Hours OT paid at RR per week | Hours OT not paid per week | OT owed |
|---|---|---|---|---|---|
| 6/13/2011 - 3/12/2013 | 91 | $17 | 18 | 5 | $25,525.50 |
| 3/13/2013 - 4/9/2013 | 4 | $20 | 18 | 5 | $1,320.00 |
| 4/10/2013 - 7/16/2013 | 14 | $22 | 18 | 5 | $5,082.00 |
| 7/17/2013 - 4/22/2014 | 40 | $26.24 | 18 | 5 | $17,318.40 |
| 7/23/2014-4/29/14 | 1 | $20.00 | 18 | 5 | $330.00 |
| | | | | **TOTAL** | **$49,575.90** |

#### d. Fabian Saravia

Opt-in plaintiff Fabian Saravia ("Saravia") testified that he was hired in November or December 2012.  (See Tr. at 105:20–25.)  His declaration, however, indicated that he was hired in December 2012.  (Declaration of Fabian Saravia, dated Oct. 12, 2017 ("Saravia Decl."), annexed as

---

[6] However, I note that his declaration suggests the maximum number of hours he typically worked was 56 per week.

Ex. 9 to Pls.' Mot., Dkt. No. 81-9, ¶ 1.)  For computational purposes, the court will select December

3, 2012 as his start date.  His starting hourly rate was $16, and remained so until the end of his

employment.  (Tr. at 106:4–9.)  For the entire period of his employment, Saravia did a combination

of driving, construction, and demolition work.  (Id. at 110:14–111:9.)  Saravia indicates that his

employment ended in March 2014.  For computational purposes, the court will select March 16, 2014

as his last date of employment.

       Saravia testified that he worked Monday through Friday, 8:00 a.m. to either 8:00 p.m.

or 9:00 p.m.  While he did not testify as to a lunch break, I will assume that he received the same

half-hour break as other employees.  Accordingly, I find that he was owed compensation for between

57.5 and 62.5 hours a week, depending how late he worked on a given day.  I will therefore estimate

that he was owed compensation for an average 60 hours per week.  I note that this is consistent with

his declaration.  (See Saravia Decl. ¶ 9.)

       Saravia further testified that he was paid for only two of every three hours of

overtime, but that he was paid these hours at the overtime rate.  Accordingly, I find that, of his

twenty hours of overtime, Saravia was only compensated for 13.3 hours per week.  I therefore

calculate his damages for unpaid overtime to be $11,446.95, broken down as follows:

| Period | Weeks | Rate | Hours OT not paid per week | OT owed |
|---|---|---|---|---|
| 12/3/2012 - 3/16/2014 | 67 | $17 | 6.7 | $11,446.95 |
| | | | **TOTAL** | **$11,446.95** |

*e.  Kareem Ransom*

       Opt-in plaintiff Kareem Ransom ("Ransom") testified that he was hired at the end of

2011.  (See Tr. at 63:7–16.)  His declaration did not specify the time of year he was hired.

(Declaration of Kareem Ransom, dated Oct. 16, 2017 ("Ransom Decl."), annexed as Ex. 15 to Pls.'

Mot., Dkt. No. 81-15, ¶ 1.)  For computational purposes, the court will select December 5, 2011 as

his start date.  His starting hourly rate was $15, and remained so until the end of his employment.

(Tr. at 64:21–25.)  For the entire period of his employment, Ransom worked as a laborer, demolition,

and construction worker.  (Ransom Decl. ¶ 3.)  Ransom indicates that his employment ended in late

2013 (Tr. at 63:18–21); for computational purposes, the court will select December 1, 2013 as his last

date of employment.

   Ransom testified that he worked Monday through Friday, 7:00 a.m. to 5:00 p.m. and

Saturday, 8:00 a.m. to 4:00 p.m.  (Id. at 63:23–64:1.)  He was given a half-hour lunch break on all

days he worked.  (Id. at 64:2–4.)  Accordingly, I find that Ransom was owed compensation for 55

hours of work per week.

   Ransom further testified that he was paid for forty hours of his time by check,

receiving additional pay for his overtime hours in cash at the regular rate.  (Id. at 66:21–67:20.)  He

then said, however, that the cash regularly added up to only $140 or $150.  (Id. at 67:21–68:25.)

Accordingly, I find that Ransom was paid ten overtime hours per week at the regular rate and was not

paid at all for five overtime hours per week.  Accordingly, I calculate his damages for unpaid

overtime to be $19,500, broken down as follows:

| Period | Weeks | Rate | Hours OT paid at RR per week | Hours OT not paid per week | OT owed |
|---|---|---|---|---|---|
| 12/5/2011 - 12/1/2013 | 104 | $15 | 10 | 5 | $19,500.00 |
| | | | | **TOTAL** | **$19,500.00** |

### f. Ramel Towles

   Opt-in plaintiff Ramel Towles ("Towles") testified that he was hired in June 2010.

(Tr. at 4:1–4; 12:8–16.)  This is consistent with his declaration.  (Declaration of Ramel Towles, dated

Oct. 13, 2017 ("Towles Decl."), annexed as Ex. 19 to Pls.' Mot., Dkt. No. 81-19, ¶ 1.)  For

computational purposes, the court will select June 21, 2010 as his start date.  His starting hourly rate

was $13, and remained so until the end of his employment.  (Tr. at 7:5–7; Towles Decl. ¶ 5.)  For the entire period of his employment, Towles worked as a laborer and bricklayer.  (Towles Decl. ¶ 2.)  Towles indicates that his employment ended in September 2013 (Tr. at 11:24–12:).  For computational purposes, the court will select September 15, 2013 as his last date of employment.

Towles testified that he worked Monday through Friday, 7:00 a.m. to 3:30 p.m., and every other Saturday, 7:00 a.m. to 2:30 or 3:00 p.m.  (Id. at 4:17–5:8.)  He also testified that, on some days, he was required to stay until 4:30 p.m., 5:00 p.m., or 6:00 p.m.  (Id. at 4:19–5:1.)  He then clarified, however, that he "usually" left at about 4:30 p.m., and only stayed past 5:30 p.m. six or seven times.  (Id. at 14:17–15:18.)  He was given a half-hour lunch break on all days he worked.  (Id. at 10:9–15.)  Accordingly, I find that Towles was owed compensation for between 44 hours and 51.5 hours of work per week.  For computational purposes, I will average this to be roughly 48 hours per week.

Towles further testified that he was paid for forty hours of his time by check, but then received additional pay for his overtime hours at the regular rate.  (Id. at 66:21–67:20.)  He also said that the checks were regularly short as much as eight to sixteen hours a week.  (Id. at 13:22–14:7.)  Accordingly, I find that for roughly half the weeks he worked, Towles received his overtime hours per week at the regular rate.  For the other half, he was not paid at all for eight overtime hours per week.  Accordingly, I calculate his damages for unpaid overtime to be $17,628, broken down as follows:

| Period | Weeks | Rate | Hours OT paid at RR per week | Hours OT not paid per week | OT owed |
|---|---|---|---|---|---|
| 6/21/2010 - 9/15/2013 | 84 (half) | $13 | 8 | - | $4,368.00 |
| 6/21/2010 - 9/15/2013 | 85 (half) | $13 | - | 8 | $13,260.00 |
| | | | | **TOTAL** | **$17,628.00** |

### g. *Freddy Alvarez*

Opt-in plaintiff Freddy Alvarez ("Alvarez") testified[7] that he worked for defendants during two different periods. This is inconsistent with his declaration, which refers to three periods of employment: "from approximately April or May of 2010 through approximately January 2011, then again from approximately April 2011 through approximately February 2012, then again from approximately April 2012 through approximately August 2012." (Declaration of Freddy Alvarez, dated Oct. 23, 2017 ("Alvarez Decl."), annexed as Ex. 11 to Pls.' Mot., Dkt. No. 81-11, ¶ 1.) In the first period, Alvarez testified, he began work in "2011 or late 2010"—"but it wasn't for a very long time because then I was able to get something else." (Tr. at 145:19–146:5.) During that time he worked only as a laborer and earned an hourly rate of either $9 or $10 (id. at 147:2–7). For computational purposes, I will calculate his hourly rate during this period as $9.50. I find that the testimony is more credible in referring to two periods of employment, but that the declaration's stated end date of January 2011 is consistent with his testimony (that the period did not last long). I will, for computational purposes, select October 4, 2010 as his start date and January 30, 2011 as his end date for this first period.

In the second period, which Alvarez says commenced "sometime in 2012," (id. at 145:19–25), he took on additional duties as a driver; this appears to have been what led to an increase in his hourly rate to $15. (Id. at 147:1–7.) It was not entirely clear from his testimony whether these additional duties began immediately when he resumed working for defendants or later; for computational purposes, the court will therefore treat his change in rate and duties as having occurred when he began his second period of employment.[8] For computational purposes, the court will select

---

[7] Alvarez appeared by telephone.

[8] Given that Alvarez left defendants' employ originally because he found other work, it seems plausible that he would not have returned to work for them at the same rate as when he left—particularly since the earlier pay rate Alvarez reported is considerably lower than the rates testified to by other plaintiffs during that time period.

June 6, 2012 as Alvarez's first day of employment in this second period.  Several paystubs submitted

with plaintiffs' supplemental submissions, however, show that his hourly rate had increased to $16 as

of May 15, 2013 and to $17 as of September 11, 2013.  (See Documentation of Damages for Opt-In

Plaintiff Freddy Alvarez, annexed as Ex. 11 to Supp. Reznick. Decl. ("Alvarez Docs"), Dkt. No. 84-

9, at 9–10.)  These paystubs, as well as several timesheets, also indicate that Alvarez was employed

as late as November 19, 2013, but that his last week working a full five-day workweek ended

November 12, 2013.  (Id. at 11; 97–101.)  For computational purposes, then, the court will treat

November 12, 2013 as Alvarez's last day of employment.

       Alvarez testified that, when he worked solely as a laborer, he worked about 45 to 50

hours per week.  (Tr. at 149:14–151:8; see also Alvarez Decl. ¶ 8.)  He further testified that, when he

worked as a driver, he typically worked Mondays through Fridays from 7:00 a.m. to approximately

6:00 p.m., but sometimes stayed as late as 8:00 p.m. because his duties typically involved picking up

items that others had used in the course of the work day on the job site.  (Tr. at 147:8–18, 149:14–

150:12.)  One timesheet included in plaintiffs' supplemental submission, for example, shows him

working from 7:00 a.m. to 9:30 p.m.  (Alvarez Docs at 60.)  Alvarez's declaration states that he

"sometimes took a half hour lunch break, but sometimes had to work through lunch."  (Alvarez Decl.

¶ 6.)

       Alvarez's testimony did not explicitly address whether he worked Saturdays or

Sundays.  His declaration states that he worked "Saturday from approximately 7:00 am through

approximately 4:30 pm" and about two Sundays per month "from approximately 7:00 am through

4:30 pm."  (Alvarez Decl. ¶¶ 6–7.)  I have not, however, identified any evidence in the record to

corroborate this.  For example, the timesheets produced by the non-defaulting defendants for the

month of September 2013 do not show that he worked a single Saturday or Sunday in that month.

(See Alvarez Docs at 65, 37, 44, and 14.)  While there are a few records that show Alvarez worked

an occasional Saturday or Sunday, these records do not reflect other hours worked during the week.

(See id. at 31.)  All of this, combined with the fact that Alvarez did not discuss weekend work during his testimony, makes it impossible for me to conclude that Alvarez consistently or predictably worked on weekends such that I could assess damages for unpaid overtime on the weekend on a weekly basis.

Overall, I find that, during the first period of his employment, Alvarez was owed compensation for between 45 and 50 hours per week; for computational purposes, I will average this to be 47.5 hours.  I find that, during the second period of his employment, Alvarez was owed compensation for approximately 54.5 hours per week.

Alvarez says that he was not paid the overtime rate for any hours worked over forty. (Tr. at 151:9–12; Alvarez Decl. ¶ 9.)  Accordingly, I calculate his damages for unpaid overtime to be $8,906.88, broken down as follows:[9]

| Period | Weeks | Rate | Hours OT paid at RR per week | OT owed |
|---|---|---|---|---|
| 10/4/2010 - 1/30/2011 (P1) | 17 | $9.50 | 7.5 | $605.63 |
| 6/6/2012 - 5/14/2013 (P2) | 48 | $15.00 | 14.5 | $5,220.00 |
| 5/15/2013 - 9/10/2013 (P2) | 17 | $16.00 | 14.5 | $1,972.00 |
| 9/11/2013 - 11/12/2013 (P2) | 9 | $17 | 14.5 | $1,109.25 |
| | | | TOTAL | $8,906.88 |

### h.  Luis Aguilar

Opt-in plaintiff Luis Aguilar ("L. Aguilar") testified[10] that he did not know exactly when was hired.  (Tr. at 137:2–6.)  When prompted by plaintiffs' counsel, L. Aguilar stated that the fall of 2011 "sounds about right."  (Id.)  His declaration states that his employment began in the fall of 2011.  (Declaration of Luis Marcelo Aguilar, dated Oct. 20, 2017 ("L. Aguilar Decl."), annexed as

[9] In the following table and in subsequent summaries of damages, I refer to the two periods of Alvarez's employment as Period 1 ("P1") and Period 2 ("P2").

[10] L. Aguilar appeared by telephone.

27

Ex. 16 to Pls.' Mot., Dkt. No. 81-16, ¶ 1.)  At a deposition in September 2016, however, L. Aguilar

stated that he started in 2012.  (See Transcript of Deposition of Luis Aguilar, dated Sept. 30, 2016

("L. Aguilar Dep."), annexed as part of Documentation of Damages for Opt-In Plaintiff Luis Aguilar,

annexed as Ex. 16 to Supp. Reznick. Decl. ("L. Aguilar Docs"), Dkt. No. 84-14, at 55 [26:8–11 in

deposition pagination].)  For computational purposes, the court will select a date between September

2011 and September 2012—March 7, 2012—as his start date.  L. Aguilar testified that he performed

both construction and demolition work for defendants throughout his employment.  (Tr. at 137:19–

21.)  He also testified that his employment ended sometime "after" 2014 (id. at 137:7–18).  However,

plaintiffs submitted what they considered to be his last paystub, which indicates he was employed

through August 5, 2014 (L. Aguilar Docs at 21).  In his deposition, moreover, he discussed having

been fired during 2014, but could not recall exactly when.  (L. Aguilar Dep. at 57 [28:9–25 in

deposition pagination].)  Accordingly, I find that August 5, 2014 was his last date of employment.

   L. Aguilar testified that his starting hourly rate was $12, and that it rose to either $18

or $20 by the time his employment ended.  (Tr. at 137:25–138:6.)  The paystubs submitted by

plaintiffs indicate that his hourly rate had increased to $16 as of February 20, 2013 and to $18 as of

April 17, 2013.  (L. Aguilar Docs at 19–20.)  It appears that his hourly rate remained $18 until the

end of his employment, as this is the rate that appears on the final paystub.  (Id. at 21.)

   L. Aguilar testified that on Mondays through Fridays, he worked a variable schedule:

"It could be 8 [a.m.] to 6 [p.m.], 8 [a.m.] till 7 [p.m.], 8 [a.m.] till 5 [p.m.]."  (Tr. at 138:7–9.)  His

declaration stated that he typically worked "Monday through Friday from 8 am – 5 pm and from 8

am until at least 7pm and sometimes as late as 10 pm."  (L. Aguilar Decl. ¶ 6.) L. Aguilar also

testified that he sometimes worked until 1:00 a.m., but he was not specific as to how often this

occurred.  (Tr. at 138:13–20.)  Finally, he testified that he would "sometimes" work Saturdays:

"Sometimes two Saturdays a month. Sometimes one Saturday a month. Sometimes three Saturdays a

month, depending."  (Id. at 139:3–5.)  He said, however, that when he did work Saturdays it would

be for no more than eight hours, though he did not provide a rough estimate of when those hours were scheduled.  (Id. at 139:13–23.)  L. Aguilar also testified that he occasionally worked on Sundays, but that these were rare occurrences, perhaps four times per year or less.  (Id. at 139:6–12.) In his declaration, L. Aguilar states that he was given a half-hour lunch break on all days that he worked.  (See L. Aguilar Decl. ¶ 6.)

   The total lack of specificity in this testimony provides a very poor basis for the court to determine L. Aguilar's hours worked.  For computational purposes, however, I will assume L. Aguilar worked about two Saturdays per month.  Because he states that his Sunday hours were very infrequent, I will not include these in determining his average weekly hours.  Using these inferences, I find L. Aguilar was owed compensation for between 46.25 and 56.25 hours per week.  For computational purposes, I will use the average between these numbers of 51.25 hours per week.

   L. Aguilar further testified that he was only paid for about three or four overtime hours out of every ten worked.  (Tr. at 140:15–141:3.)  For those overtime hours, he was paid at the overtime rate; for the others, he was not paid at all.  (Id.)  He said this happened "all the time," with every paycheck.  (Id. at 141:15–20.)  For computational purposes, I find that L. Aguilar was paid for approximately thirty-five percent of his overtime hours at the regular rate (i.e., roughly 4 hours per week) and was not paid at all for the remaining sixty-five percent of his overtime hours (i.e., 7.25 hours per week).  Accordingly, I calculate L. Aguilar's damages for unpaid overtime to be $25,132, broken down as follows:

| Period | Weeks | Rate | Hours OT paid at RR per week | Hours OT not paid per week | OT owed |
|---|---|---|---|---|---|
| 3/7/2012 - 2/19/2013 | 50 | $12 | 4 | 7.25 | $7,725.00 |
| 2/20/2013 - 4/16/2013 | 8 | $16 | 4 | 7.25 | $1,648.00 |
| 4/17/2013 - 8/5/2014 | 68 | $18 | 4 | 7.25 | $15,759.00 |
| | | | | TOTAL | $25,132.00 |

### i. *Manuel Aguilar*

Opt-in plaintiff Manuel Aguilar ("M. Aguilar") testified[11] that he was hired in mid-2007 or 2008.  (Tr. at 127:24–25.)  His declaration, however, stated that he was hired in "approximately 2007."  (Declaration of Manuel Aguilar, dated Oct. 23, 2017 ("M. Aguilar Decl."), annexed as Ex. 17 to Pls.' Mot., Dkt. No. 81-17, ¶ 1.)  In a deposition taken in late 2016, M. Aguilar testified that he started working in the middle of November or December of 2007.  (Deposition of Manuel Aguilar, dated Sept. 30, 2016 ("M. Aguilar Dep."), annexed as part of Documentation of Damages for Opt-In Plaintiff Manuel Aguilar, annexed as Ex. 17 to Supp. Reznick. Decl. ("M. Aguilar Docs"), Dkt. No. 84-15, at 28.)  I find this deposition testimony to be the most specific and most credible of these three statements.  For computational purposes, the court will select November 12, 2007 as his start date.  However, because any date in 2007 or early 2008 would fall outside the six-year NYLL statute of limitations, the court will begin calculating wages owed from May 19, 2008—six years prior to the filing of the complaint.  M. Aguilar testified that he worked as a carpenter, and that he did demolition work; his declaration states that he worked as a laborer and carpenter.  (Id. at 127:16–18; M. Aguilar Decl. ¶ 2.)

M. Aguilar testified that his starting hourly rate was $13, and that he was initially paid all in cash.  (Tr. at 129:12–14.)  When defendants started paying him by check, his hourly rate rose to $15; M. Aguilar estimated that this occurred six to eight months after he started.  (Id. at 129:18–130:8.)  For computational purposes, then, the court will calculate that M. Aguilar's hourly rate increased to $15 seven months after his approximate start date, on June 16, 2008.  M. Aguilar further testified that, by the time his employment ended, his hourly rate was $20 per hour.  It had increased, he said, gradually, in $1 or $2 increments.  (Id. at 129:9–13.)  Paystubs submitted by plaintiffs indicate that M. Aguilar was still earning $18 per hour as of February 26, 2013, but that his

---

[11] M. Aguilar appeared by telephone.

hourly rate increased on February 27, 2013 to $20 per hour.  (M. Aguilar Docs.)  Because there is no

other testimony or information in the record that can speak to his pay increases, I will assume, for

computational purposes, that M. Aguilar's hourly rate increased in the following increments: to $16

on June 15, 2009; to $17 on June 21, 2010; and to $18 on June 20, 2011.  M. Aguilar testified that his

employment ended in November 2014 (Tr. at 127:1–15). For computational purposes, the court will

select November 18, 2014 as his last date of employment.

       M. Aguilar testified that he worked Monday through Friday, starting at 8:00 a.m. and

working "until the job was done," often until 6:00 p.m. or 7:00 p.m.  (Id. at 128:8–15.)  I would note

that this schedule does diverge somewhat from M. Aguilar's declaration, in which he states that he

worked until "at least" 5:00 p.m. and "sometimes as late as 7pm – 10pm."  (M. Aguilar Decl. ¶ 6.)

He further testified that he worked three Saturdays per month, 8:00 a.m. to 5:00 p.m. or 6:00 p.m.

(Id. at 128:19–129:7.)  He also testified that he worked two Sundays per month, 8:00 a.m. to 5:00

p.m.  (Id.)  He was given a half-hour lunch break on all days he worked.  (Id. at 129:8–11; M.

Aguilar Decl. ¶ 6.)  Based on this schedule, as stated at the inquest hearing, I find that M. Aguilar

was owed compensation for an average of 61 hours per week.

       M. Aguilar testified that he was not paid the overtime rate for any hours worked over

forty, but was instead paid the regular rate for all overtime hours for which defendants paid him.  (Tr.

at 130:14–16.)  He further testified, however, that defendants regularly failed to pay him for an

average of four to five hours of overtime per week, "and sometimes up to eight hours."  (Id. at

130:17–131:5.)  Averaging this, I find that defendants regularly failed to pay M. Aguilar for 4.5

hours of overtime per week.  Accordingly, I calculate his damages for unpaid overtime to be

$89,490, broken down as follows:

| Period | Weeks | Rate | Hours OT paid at RR per week | Hours OT not paid per week | OT owed |
|---|---|---|---|---|---|
| 5/19/2008 - 6/15/2008 | 4 | $13 | 16.5 | 4.5 | $780.00 |

| | | | | |
|---|---|---|---|---|
| 6/16/2008 - 6/14/2009 | 52 | $15 | 16.5 | 4.5 | $11,700.00 |
| 6/15/2009 - 6/20/2010 | 53 | $16 | 16.5 | 4.5 | $12,720.00 |
| 6/21/2010 - 6/19/2011 | 52 | $17 | 16.5 | 4.5 | $13,260.00 |
| 6/20/2011 - 2/26/2013 | 89 | $18 | 16.5 | 4.5 | $24,030.00 |
| 2/27/2013 - 11/18/2014 | 90 | $20 | 16.5 | 4.5 | $27,000.00 |
| | | | | **TOTAL** | **$89,490.00** |

### j. Summary of Unpaid Overtime Owed to Testifying Plaintiffs

Based on the foregoing, I find that the testifying plaintiffs are owed $321,284.69 in unpaid overtime. The table below summarizes the unpaid overtime owed for each of the testifying plaintiffs:

| Plaintiff | OT Owed |
|---|---|
| Washington Condor | $42,008.00 |
| Oscar Remache | $57,494.00 |
| Walter Cepeda | $49,575.90 |
| Fabian Saravia | $11,446.95 |
| Kareem Ransom | $19,500.00 |
| Ramel Towles | $17,628.00 |
| Freddy Alvarez | $8,906.88 |
| Luis Aguilar | $25,132.00 |
| Manuel Aguilar | $89,490.00 |
| **TOTAL** | $321,181.73 |

### 5. Liquidated Damages

Plaintiffs request liquidated damages under the NYLL.[12]  (Reznick Decl. ¶¶ 24–28.)

"Prior to 2009, an employee bore the burden to demonstrate the employer's willful failure to pay

---

[12] Technically, plaintiffs would be eligible for liquidated damages under both the FLSA and the NYLL, but the Second Circuit recently held that plaintiffs may not recover liquidated damages under both statutes.  See Rana v. Islam, 887 F.3d 118, 119 (2d Cir. 2018) (explaining that New York's revision of its liquidated damages provision suggested that liquidated damages in both statutes serve same purpose, whereas under previous case law it was reasonable to conclude that 60% NYLL

(Continued . . .)

wages, and upon establishing this, the employee could be awarded as liquidated damages an amount up to 25% of the total amount of wages due." Rana v. Islam, 887 F.3d 118, 122 (2d Cir. 2018) (citing Ryan v. Kellogg Partners Institutional Servs., 968 N.E.2d 947, 952 n.8 (N.Y. 2012)). "But in 2009, the liquidated damages provision was amended to bring it more closely in line with the FLSA; the burden was shifted to the employer to "'prove[ ] a good faith basis to believe that its underpayment of wages was in compliance with the law' in order to avoid liquidated damages." Id. (quoting Ryan, 968 N.E.2d at 952 n.8 (quoting 2009 N.Y. LAWS ch. 372 § 1). The NYLL liquidated damages provision was amended a second time in 2010, effective April 9, 2011, to provide that plaintiffs could recover liquidated damages equal to one hundred percent of their unpaid wages. See 2010 N.Y. LAWS ch. 564 § , amending N.Y. LAB. L. § 198(1-b); Rana, 887 F.3d at 123. Under the amendment, "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total of such underpayments found to be due" shall be recovered by the employee. N.Y. LAB. L. § 663(2). Thus, all liquidated damages for violations which occurred prior to April 9, 2011 are assessed at twenty-five percent of the unpaid wages, while all for violations on and after April 9, 2011 are assessed at one hundred percent.

As defendants have defaulted, they have not established good faith to rebut this presumption; similarly, for any unpaid wages incurred prior to the 2009 amendment, plaintiffs have clearly met their burden in establishing willfulness. I therefore respectfully recommend that the testifying plaintiffs each be awarded liquidated damages under the NYLL. Accordingly, plaintiffs should be awarded a total of $257,620.17 in liquidated damages, broken down as follows:[13]

---

liquidated damages served a different purpose from 100% FLSA liquidated damages); see also Chowdhury v. Hamza Express Food Corp., 666 F. App'x 59, 61 (2d Cir. 2016) (summary order).
[13] In this table and subsequent tables, certain terms are abbreviated as follows: liquidated ("liq.") and compensatory ("compens.").

| Plaintiff | Pre-4/9/2011 | | Post-4/9/2011 | | |
| | Compens. Damages | 25% Liq. Damages | Compens. Damages | 100% Liq. Damages | Total Liq. Damages to Plaintiff |
|---|---|---|---|---|---|
| Washington Condor | $10,828.61 | $2,707.15 | $31,179.39 | $31,179.39 | $33,886.54 |
| Oscar Remache | $12,132.86 | $3,033.21 | $29,568.02 | $29,568.02 | $32,601.23 |
| Walter Cepeda | n/a | n/a | $49,575.90 | $49,575.90 | $49,575.90 |
| Fabian Saravia | n/a | n/a | $11,446.95 | $11,446.95 | $11,446.95 |
| Kareem Ransom | n/a | n/a | $19,500.00 | $19,500.00 | $19,500.00 |
| Ramel Towles | $4,323.43 | $1,080.86 | $13,304.57 | $13,304.57 | $14,385.43 |
| Freddy Alvarez | $605.63 | $151.41 | $8,301.25 | $8,301.25 | $8,452.66 |
| Luis Aguilar | n/a | n/a | $25,132.00 | $25,132.00 | $25,132.00 |
| Manuel Aguilar | $35,800.71 | $8,950.18 | $53,689.29 | $53,689.29 | $62,639.46 |
| | | | | **TOTAL** | $257,620.17 |

## 6. Wage Notice Violations

Plaintiffs further request statutory damages for defendants' failure to provide wage notices in compliance with the NYLL, both at the time of hiring and annually.  Beginning April 9, 2011, New York's Wage Theft Prevention Act ("WTPA") required employers to provide written wage notices "at the time of hiring, and on or before February first of each subsequent year of the employee's employment with the employer."  N.Y. LAB. LAW § 195(1-a) (eff. Apr. 9, 2011 to Feb. 27, 2015); Cabrera v. 1560 Chirp Corp., No. 15 CV 8194, 2017 WL 1289349, at *7 (S.D.N.Y. Mar. 6, 2017), report and recommendation adopted, 2017 WL 1314123 (S.D.N.Y. Apr. 6, 2017).  By an amendment to the WTPA, that provision changed, effective February 27, 2015, to one that required employers to provide written wage notices only "at the time of hiring."  2014 N.Y. LAWS ch. 537 § 1, amending N.Y. LAB. LAW § 195(1-a).  Because, however, all testifying plaintiffs' work ended prior to that change, and because plaintiffs commenced this action prior to that change, the original version of the WTPA determines the damages plaintiffs can collect here.

It is clear that employees who were hired prior to the effective date of the WTPA cannot recover statutory damages for an employer's failure to provide wage notices at the time of

hiring, as the WTPA does not apply retroactively.  See Inclan v. N.Y. Hospitality Grp., 95 F. Supp.

3d 490, 501–02 (S.D.N.Y. 2015) (citing Gold v. N.Y. Life Ins. Co., 730 F.3d 137, 143–44 (2d Cir.

2013); Kim v. Kum Gang, Inc., No. 12 CV 6344, 2015 WL 2222438, at *31 (S.D.N.Y. Mar. 19,

2015) ("With only one exception (a New York State Supreme Court decision), the reported decisions

have held that these new provisions do not apply retroactively, and that consequently any asserted

violations occurring before the effective date of the new law must be judged in accordance with the

pre-existing statutory language.") (collecting cases) (footnote omitted).  Many courts have held,

however, that neither those employees—nor any employees— are entitled to pursue civil damages

for annual wage notice violations.  See, e.g., Pierre v. Hajar, Inc., No. 15 CV 2772, 2018 WL

2393158, at *5 (E.D.N.Y. Mar. 28, 2018) ("Courts have, accordingly, thus found that an employee

who began working before the WTPA took effect on April 9, 2011, may not bring a claim for an

employer's failure to provide wage notices.") (collecting cases) (internal quotation marks omitted);

Canelas v. A'Mangiare Inc., No. 13 CV 3630, 2015 WL 2330476, at *5 (S.D.N.Y. May 14, 2015)

("[A]n employee who began working before the WTPA took effect on April 9, 2011, may not bring a

claim for an employer's failure to provide wage notices.")  Other courts have concluded that those

employees were still entitled to damages for their employer's failure to provide them annual wage

notices by February 2 of each year.  See, e.g., Inclan, 95 F. Supp. 3d at 502 ("However, the WTPA

also required the Restaurant to provide annual notice of the tip credit to its employees on or before

February 1, 2012.  It is undisputed that two of the plaintiffs . . . remained employed at the Restaurant

after that date.  As the Restaurant did not provide them with WTPA-compliant wage notice

statements, plaintiffs may recover statutory damages of $50 per work week during the time of their

employment after that date.") (footnotes and internal citations omitted).

       I agree with those courts that have held that no damages are available for annual

wage notice violations, as the text of the statute is contrary to such a result.  The civil penalty

provision is "activated solely if a wage notice 'is not provided within ten business days of his or her

first day of employment,' absent any reference to annual renewals." <u>Sanchez v. First Class Home</u>

<u>Improvement, LLC</u>, No. 16 CV 2064, 2018 WL 4100490, at *10 (E.D.N.Y. Aug. 28, 2018) (quoting

NYLL § 198(1-b)) (citation omitted).  Even though the Act, prior to the 2015 amendments, required

annual wage notices, it did not provide that employees could recover civil damages for a violation of

this requirement;[14] only the New York Department of Labor could pursue such remedies.  <u>See</u> 2010

N.Y. LAWS ch. 564 § 7, <u>amending</u> N.Y. LAB. LAW § 198(1-b).                     Prior to

February 27, 2015, "the WTPA entitled employees to recover statutory damages for wage notice

violations of $50 per work week, not to exceed $2,500."  <u>Baltierra v. Advantage Pest Control Co.</u>,

No. 14 CV 5917, 2015 WL 5474093, at *11 (S.D.N.Y. Sept. 18, 2015); <u>Galicia v. 63-68 Diner Corp.</u>,

No. 13 CV 3689, 2015 WL 1469279, at *8 (E.D.N.Y. Mar. 30, 2015) ("For Defendants' initial

failure to provide a written wage notice within ten business days of hiring Plaintiff, Plaintiff is

entitled to recover $50 for each workweek that the violation continued, up to a statutory maximum of

$2,500."); <u>see also</u> 2010 N.Y. LAWS ch. 564 § 7, <u>amending</u> N.Y. LAB. LAW § 198(1-b).  All of the

testifying plaintiffs stated at the inquest that defendants had never provided them with wage notices.

(<u>See</u> Tr. at 91:14–17 (Condor), 52:1–3 (Remache), 26:20–23 (Cepeda), 109:3–5 (Saravia), 69:5–14

(Ransom), 5:24–6:1 (Towles), 148:23–25 (Alvarez), 141:4–10 (L. Aguilar), 131:25–132:12 (M.

Aguilar).)  Only Cepeda, Saravia, Ransom, Alvarez (in Period 2 of his employment), and L. Aguilar

---

[14] Indeed, I note that one of the cases cited by plaintiff's counsel in her declaration in support of the
motion for default judgment (<u>see</u> Reznick Decl. ¶ 32) reached this same result.  <u>See</u> <u>Garcia v.</u>
<u>Ditmars Square, Inc.</u>, No. 16 CV 166, 2017 U.S. Dist. LEXIS 36433, at *28–29 (E.D.N.Y. Mar. 10,
2017) ("[T]he versions of NYLL § 198 that were effective from April 9, 2011 to February 26, 2015,
and from February 27, 2015 to January 18, 2016 only permit an employee to obtain damages for
written notices that were not provided to the employee within ten days of the start of his
employment, rather than for written notices that were not provided every February.") (citations
omitted).  Counsel did not, however, alert the court to this issue—nor attempt to argue that it was wrongly decided.  Instead, they contended that they were
owed $2,500 annually for each plaintiff who did not receive a hiring or annual notice.  (<u>See, e.g.</u>,
Explanation of Damage Models, annexed as Ex. 1 to Pls.' Mot., Dkt. No. 81-1, at ¶ 21; Washington
Condor Damage Summary, annexed as Ex. 3 to Pls.' Mot., Dkt. No. 81-3, at 2 (listing wage notice
damages for Condor, who was hired pre-WTPA, as $2,500 per year from 2011-2014).)

were hired after the WTPA became effective.  As all were employed for more than fifty weeks, they are each entitled to the maximum statutory damages for defendants' failure to provide them wage notices within ten days of hiring.  Accordingly, I respectfully recommend that Cepeda, Saravia, Ransom, Alvarez, and L. Aguilar each be awarded $2,500 in statutory damages, for a total of $12,500.

### 7. Wage Statements

Plaintiffs also request statutory damages for defendants' failure to provide wage statements in compliance with the NYLL.  As of April 9, 2011, the WTPA required employers to furnish each employee with a statement with every payment of wages—i.e., a paystub—that lists pertinent information such as the dates of work covered by that payment of wages, the rate or rates of pay and the basis thereof, deductions, and allowances.  Salinas v. Starjem Rest. Corp., 123 F. Supp. 3d 442, 475 (S.D.N.Y. 2015) (quoting N.Y. LAB. LAW § 195(3)); see also Baltierra, 2015 WL 5474093, at *10–11.  These statements must be accurate to satisfy the law's requirements.  See Copper v. Cavalry Staffing, LLC, 132 F. Supp. 3d 460, 467–69 (E.D.N.Y. 2015) (Block, J.) (finding, as a matter of first impression, that NYLL § 195(3) required that wage statements contain an accurate account of overtime hours an employee actually worked, rather than just a statement of the overtime hours for which the employee is being paid, and that a contrary holding would be contrary to the text and legislative history of the WTPA).

Prior to February 27, 2015, "the WTPA entitled employees to recover statutory damages for violations of the wage statement requirement of $100 per work week, not to exceed $2,500." Baltierra, 2015 WL 5474093, at *10 (citation omitted); accord Inclan, 95 F. Supp. 3d at 501; see also 2010 N.Y. LAWS ch. 564 § 7, amending N.Y. LAB. LAW § 198(1-d).  By an amendment to the WTPA effective February 27, 2015, the law changed to allow employees to recover wage-statement statutory damages of $250 dollars "for each work day that the violations occurred or continue to occur," not to exceed $5,000.  2014 N.Y. LAWS ch. 537 § 2, amending N.Y.

LAB. LAW § 198(1-d); see also Zhang v. Red Mtn. Noodle House Inc., No. 15 CV 628, 2016 WL 4124304, at *6 (E.D.N.Y. July 5, 2016), report and recommendation adopted, 2016 WL 4099090 (E.D.N.Y. Aug. 2, 2016).   However, because all of the plaintiffs' employment ended prior to February 27, 2015, plaintiffs may only recover based on the statutory damages available prior to this amendment.

    All of the plaintiffs testified that they received paystubs, but each reported that, in one manner or another, those paystubs were inaccurate with respect to their hours worked, as described in more detail above.   Some of the paystubs contained no overtime hours when overtime hours were worked, while others contained only a portion of the overtime hours actually worked, as reported by plaintiffs.   I therefore find that plaintiffs are entitled to statutory damages due to defendants' failure to regularly provide accurate wage statements.   As all were employed for more than twenty-five weeks after April 9, 2011, they are each entitled to the maximum statutory damages of $2,500.   I therefore respectfully recommend that all nine testifying plaintiffs be awarded $2,500 each for defendants' failure to provide them with accurate wage statements, for a total of $22,500.

### 8. Prejudgment Interest

    Plaintiffs request and are entitled to prejudgment interest on their unpaid wages under the NYLL. See N.Y. LAB. LAW § 663; Fermin v. Las Delicias Peruanas Rest., Inc., 93 F. Supp. 3d 19, 48 (E.D.N.Y. 2015) ("In contrast to the FLSA, the NYLL permits an award of both liquidated damages and prejudgment interest.").   "Prejudgment interest is calculated on the unpaid wages due under the NYLL, not on the liquidated damages awarded under the state law."   Fermin, 93 F. Supp. 3d at 49 (internal quotation marks and citation omitted).

    The statutory rate of interest is nine percent per annum.   N.Y. C.P.L.R. § 5004. Where damages were incurred at various times, interest may be calculated from a single reasonable intermediate date.   Id. § 5001(b).   Plaintiffs ask that interest be calculated from the midpoint of each plaintiff's employment (Reznick Decl. ¶ 35), which is a reasonable intermediate date for purposes of

calculating prejudgment interest.  See Fermin, 93 F. Supp. 3d at 49; Wicaksono v. XYZ 48 Corp.,
No. 10 CV 3635, 2011 WL 2022644, at *9 (S.D.N.Y. May 2, 2011), report and recommendation
adopted, 2011 WL 2038973 (S.D.N.Y. May 24, 2011).

      Accordingly, I respectfully recommend that prejudgment interest at the rate of nine
percent per annum be awarded based on the following compensatory damages, midpoints, and per
diem[15] rates:

| Plaintiff | Start Date | End Date | Compensatory Damages | Midpoint | Per Diem Rate |
|---|---|---|---|---|---|
| Washington Condor | 9/14/09 | 2/18/14 | $42,008.00 | 12/2/11 | $10.36 |
| Oscar Remache | 6/14/10 | 2/18/14 | $57,494.00 | 4/16/12 | $14.18 |
| Walter Cepeda | 6/13/11 | 4/29/14 | $49,575.90 | 11/19/12 | $12.22 |
| Fabian Saravia | 12/3/12 | 3/16/14 | $11,446.95 | 7/25/13 | $2.82 |
| Kareem Ransom | 12/5/11 | 12/1/13 | $19,500.00 | 12/2/12 | $4.81 |
| Ramel Towles | 6/21/10 | 9/15/13 | $17,628.00 | 2/2/12 | $4.35 |
| Freddy Alvarez P1 | 10/4/10 | 1/30/11 | $605.63 | 12/2/10 | $0.15 |
| Freddy Alvarez P2 | 6/6/12 | 11/12/13 | $8,301.25 | 2/23/13 | $2.05 |
| Luis Aguilar | 3/2/12 | 8/5/14 | $25,132.00 | 5/19/13 | $6.20 |
| Manuel Aguilar | 5/19/08 | 9/15/13 | $89,490.00 | 1/16/11 | $22.07 |

### 9. Post Judgment Interest

      Plaintiffs also request and are entitled to an award of post judgment interest.  (See
Compl. ¶ 11.)  Section 1961 provides that "interest shall be allowed on any money judgment in a
civil case recovered in a district court."  28 U.S.C. § 1961(a).  Under the statute, interest is calculated
"from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant
maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for
the calendar week preceding[ ] the date of the judgment."  Id.  Thus, I respectfully recommend that

---

[15] Per diem rates are calculated according to this formula: (compensatory damages) x (0.09/365).

plaintiffs be awarded statutory post-judgment interest.  See Fermin, 93 F. Supp 3d at 53 (finding that post-judgment interest is mandatory).

### 10. Attorney's Fees

Plaintiffs move for an award of reasonable attorney's fees.  Both the FLSA and the NYLL permit courts to award reasonable attorney's fees to the prevailing party.[16]  Because these laws require such awards to be "reasonable," the court must determine whether plaintiffs' proposed hourly rates are reasonable, and whether the hours billed for the work were necessary.  Those fees are then reduced by the $41,667 in attorney's fees that plaintiffs already recovered from the non-defaulting defendants.  (Reznick Decl. ¶ 37.)

As a threshold matter, the party seeking fees must provide accurate, detailed and contemporaneous attorney time records.  See Scott v. City of New York, 643 F.3d 56, 58–59 (2d Cir. 2011); Green v. City of New York, 403 F. App'x 626, 630 (2d Cir. 2010); N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983); In re Phelan, 570 N.Y.S.2d 202, 203 (2d Dep't 1991).  Plaintiffs have satisfied this requirement.  (See Time Records of Leeds Brown Law, P.C., filed June 4, 2018 ("Time Recs."), Dkt. No. 86-1.)

The court next assesses whether plaintiffs request a reasonable hourly rate.  A reasonable hourly rate is "the rate a paying client would be willing to pay," "bear[ing] in mind that a reasonable paying client wishes to spend the minimum necessary to litigate the case effectively." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 522 F.3d 182, 190 (2d Cir. 2008).  Reasonable hourly rates should be based on "rates prevailing in the community for similar

---

[16] See 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); N.Y. Lab. Law § 198(1-a) ("In any action instituted in the courts upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee to recover . . . all reasonable attorney's fees . . . ."); N.Y. Lab. Law § 198(1-b) (reasonable attorney's fees and costs in action for wage notice violations); N.Y. Lab. Law § 198(1-d) (reasonable attorney's fees and costs in action for wage statement violations).

services of lawyers of reasonably comparable skill, experience, and reputation." Cruz v. Local Union No. 3 of IBEW, 34 F.3d 1148, 1159 (2d Cir. 1994) (citing Blum v. Stenson, 465 U.S. 886, 894 (1984)).  A judge may determine prevailing rates based on evidence presented or his or her own knowledge of rates charged in the community.  Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1059 (2d Cir. 1989).  The "community" is generally considered to be the district where the court sits.  See Arbor Hill, 522 F.3d at 190.   Also, "the nature of representation and type of work involved in a case are critical ingredients in determining the 'reasonable' hourly rate." Arbor Hill, 522 F.3d at 184 n.2 (citations omitted).

Plaintiffs request a fee award of $238,664.75, minus the $41,667 previously recovered in fees from the settlement, for a total requested award from the Mac Hudson defendants of $196,997.75.  That request, however, relies on fees that are significantly higher than the reasonable attorneys' fees approved for attorneys comparable to those in this case.[17]  Based on my review of the hourly rates awarded to similarly experienced attorneys in this district,[18] I find it appropriate to reduce the hourly rates for plaintiffs' counsel.  Plaintiff's proposed rates are at the upper limit of the usual range for this district, where hourly rates higher than $350 are generally reserved for law firm partners, unusually expert litigators, or other special circumstances;[19] similarly,

---

[17] Ms. Reznick claims that the fee request is based on rates "for which we have customarily been approved" (Reznick Decl. ¶ 37), but several of the proposed rates were approved in New York state courts (id. ¶¶ 42–44).

[18] Courts in this circuit generally adhere to the "forum rule," which states that a district court should use the prevailing hourly rates in the district where it sits.  See Simmons v. N.Y. City Transit Auth., 575 F.3d 170, 172 (2d Cir. 2009); Polk v. N.Y. State Dep't of Corr. Servs., 722 F.2d 23, 25 (2d Cir. 1983).

[19] See, e.g., Gesualdi v. Mech. Insulation, Inc., No. 16 CV 5136, 2017 WL 4005600, at *4 (E.D.N.Y. Aug. 21, 2017), report and recommendation adopted, 2017 WL 4005618 (E.D.N.Y. Sept. 11, 2017) (awarding $300 per hour to an attorney with twelve years of experience, $175 per hour to an attorney with two years of experience, and $90 per hour to legal assistants); United States ex rel. Joseph F. Tommasino v. Guida, No. 10 CV 4644, 2017 WL 878587, at *4–6 (E.D.N.Y. Mar. 6, 2017) (awarding $425 per hour to an attorney with thirty-one years of commercial litigation experience,
(Continued . . .)

paralegals are typically awarded no more than $75 per hour.[20]  I will therefore adjust plaintiffs'

counsel's rates, based on the experience levels of the attorneys, based on the following fee schedule:

$75 for paralegals, $250 for associates with fewer than 4 years experience, $275 for associates and

senior associates with 4 to 9 years of experience, $325 for partners and "of counsel" attorneys with

10 to 25 years of experience, and $375 for partners with 26 or more years of experience.

Finally, the court reviews whether plaintiffs' counsel billed a reasonable number of

hours.  To determine the reasonableness of the hours spent on the litigation, the court must make "a

conscientious and detailed inquiry into the validity of the representations that a certain number of

---

$300 per hour to "the primary associate on the case," who had twenty years of commercial litigation experience, and $90 per hour for paralegal work); Anderson v. Cty. of Suffolk, No. 09 CV 1913, 2016 WL 1444594, at *4, *9 (E.D.N.Y. Apr. 11, 2016) (reducing hourly rate from $450 to $375 for attorney with more than twenty-seven years of experience as an appellate litigator in civil rights litigation and police misconduct cases and stating that "recent court decisions have awarded $400.00 to $450.00 per hour for the most experienced trial attorneys."); Morales v. B&M Gen. Renovation Inc., No. 14 CV 7290, 2016 WL 1266624, at *11 (E.D.N.Y. Mar. 9, 2016) ("the prevailing hourly rate for partners in this district is between $300 and $400"), report and recommendation adopted, 2016 WL 1258482 (E.D.N.Y. Mar. 29, 2016); Bosoro v. Am. Comprehensive Healthcare Med. Grp., P.C., No. 14 CV 1099, 2015 WL 5676679, at *9 (E.D.N.Y. Aug. 31, 2015) ("Courts have generally found the prevailing hourly rates in the Eastern District of New York to be between $350 and $400 for law firm partners"), report and recommendation adopted, 2015 WL 5686481 (E.D.N.Y. Sept. 25, 2015); Favors v. Cuomo, 39 F. Supp. 3d 276, 301–02 (E.D.N.Y. Aug. 14, 2014) (reducing hourly rate of partner in Section 1983 case brought by registered voters challenging constitutionality of state's congressional redistricting from $600 to $400); see also Perez, 2016 WL 1359218, at *8 (reducing partner's hourly rate from $400 to $350 in wage-and-hour case); D'Annunzio v. Ayken, Inc., No. 11 CV 3303, 2015 WL 5308094, at *4 (E.D.N.Y. Sept. 10, 2015) ("Courts in the Eastern District of New York award hourly rates ranging from $200 to $450 per hour for partners [and] $100 to $300 per hour for associates."); Dominguez v. B S Supermarket, Inc., No. 13 CV 7247, 2015 WL 1439880, at *15 (E.D.N.Y. Mar. 27, 2015) (awarding partner $350 hourly rate in FLSA case); Hernandez v. Prof'l Maint. & Cleaning Contractors Inc., No. 13 CV 2875, 2015 WL 128020, at *8 (E.D.N.Y. Jan. 8, 2015) (finding that "judges in the Eastern District have awarded fees in the range of $300-$400" and reducing attorney's rate to $350 an hour); Mary Jo C. v. Dinapoli, No. 09 CV 5635, 2014 WL 7334863, at *6–7 (E.D.N.Y. Dec. 18, 2014) (awarding fees at a rate of $350 per hour to attorney with over thirty years of experience specializing in disabilities law).

[20] See Morales, 2016 WL 1266624, at *11 (awarding paralegal $75 hourly rate); Cortes v. Warb Corp., No. 14 CV 7562, 2016 WL 1266596, at *6 (E.D.N.Y. Mar. 15, 2016), report and recommendation adopted, 2016 WL 1258484 (E.D.N.Y. Mar. 30, 2016) (same); Perez, 2016 WL 1359218, at *8 (reducing paralegal's rate to $75 an hour); Griffin v. Astro Moving & Storage Co., No. 11 CV 1844, 2015 WL 1476415, at *9 (E.D.N.Y. Mar. 31, 2015) ("In this district, the average hourly rate awarded to paralegals . . . is seventy-five dollars ($75.00).").

hours were usefully and reasonably expended." Maldonado v. La Nueva Rampa, Inc., No. 10 CV 8195, 2012 WL 1669341, at *13 (S.D.N.Y. May 14, 2012) (quoting Lundav v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994)). The "critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" Id. (quoting Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992)).

I find that the quality of the lawyering on display here was not always up to the standard that would be expected. In particular, the poor presentation of the evidence in this motion has made the court's task in evaluating it exceptionally difficult. Plaintiffs' counsel submitted declarations that contained numerous errors and displayed very little relationship to plaintiffs' live testimony. Plaintiffs' supplemental submission was then filed several weeks late—without an extension requested or granted—and made no effort to aid the court in reassessing the damages that were now due and owing to plaintiffs in light of the inquest testimony. Essentially, plaintiffs filed all the records they had and left the court to sort out recalculating damages. And, as noted above, plaintiffs made serious legal errors, including with respect to briefing the issue of wage notice liability.

I therefore find it appropriate to make a reduction in those hours which plaintiffs have claimed should be awarded, particularly for the preparation of employee declarations and supplemental submissions, pursuant to the court's power to exclude those hours that it finds excessive, redundant, or otherwise unnecessary. See Gordon v. Site 16/17 Development, LLC, No. 11 CV 427, 2011 WL 3251520, at *6 (S.D.N.Y. July 28, 2011) ("The documents that counsel submitted here were of mediocre quality and included numerous errors. The poor quality of counsel's work justifies an even greater reduction in the fee award."). In lieu of an itemized reduction, however, I find it appropriate to make an across the board reduction of ten percent from counsel's fees, which amounts to about 90 hours. See Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998) ("[I]n dealing with such surplusage, the court has discretion simply to deduct a

43

reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'") (quoting <u>Carey</u>, 711 F.2d at 1146).

   Accordingly, I recommend that plaintiffs be awarded $127,110 in attorney's fees. This fee award is based on the reduced fees and hours discussed above,[21] and summarized in the following table:[22]

---

[21] The fees proposed by plaintiffs assessed Ms. Reznick's fees based on two different rates, depending whether the  hours billed occurred before or after her four-year anniversary of bar admission.  (<u>See</u> Reznick Decl. ¶ 44 n.4.)  I find it more appropriate to assess all her fees based on her current level of experience.

[22] In the table, certain terms are abbreviated as follows: Years ("Yrs"); Experience ("Exp"); Hours ("Hrs"); Proposed ("Prop."); Adjusted ("Adj."); Senior ("Sr."); Associate ("Assoc.")

| Name | Role | Yrs Exp | Hrs | Prop. Rate | Prop. Fees | Adj. Hrs | Adj. Rate | Adj. Fees |
|---|---|---|---|---|---|---|---|---|
| Anusheh Khoshsima | Paralegal | n/a | 14.6 | $125 | $1,825.00 | 13.14 | $75 | $985.50 |
| Brittany Cangelosi | Paralegal | n/a | 13.1 | $125 | $1,637.50 | 11.79 | $75 | $884.25 |
| Carlos Beltran | Paralegal | n/a | 16.6 | $125 | $2,075.00 | 14.94 | $75 | $1,120.50 |
| Chris Eagan | Paralegal | n/a | 0.6 | $125 | $75.00 | 0.54 | $75 | $40.50 |
| Christopher Nenchin | Paralegal | n/a | 13.1 | $125 | $1,637.50 | 11.79 | $75 | $884.25 |
| Brett Cohen | Assoc. | 6 | 1.4 | $365 | $511.00 | 1.26 | $275 | $346.50 |
| Jeffrey K. Brown | Partner | 19 | 6 | $530 | $3,180.00 | 5.4 | $325 | $1,755.00 |
| Jeremy Siegel | Assoc. | 3 | 1.5 | $300 | $450.00 | 1.35 | $250 | $337.50 |
| Jim Tullman | Of Counsel | 25 | 18.1 | $500 | $9,050.00 | 16.29 | $325 | $5,294.25 |
| Laura Reznick | Assoc. | 5 | 88.3 | $325 | $28,697.50 | 79.47 | $275 | $21,854.25 |
| Laura Reznick | Assoc. | 5 | 336.8 | $300 | $101,025.00 | 303.08 | $275 | $83,345.63 |
| Lenard Leeds | Partner | 30 | 6 | $530 | $3,180.00 | 5.4 | $375 | $2,025.00 |
| Maria Pellegrini | Paralegal | n/a | 3.3 | $125 | $412.50 | 2.97 | $75 | $222.75 |
| Michael Tompkins | Sr. Assoc. | 7 | 133 | $405 | $53,865.00 | 119.7 | $275 | $32,917.50 |
| Ricardo Guerra | Paralegal | n/a | 224 | $125 | $27,993.75 | 201.56 | $75 | $15,116.63 |
| Tama Lynch | Paralegal | n/a | 24.4 | $125 | $3,050.00 | 21.96 | $75 | $1,647.00 |
| | | | 900.7 | | $238,664.75 | 810.63 | | $168,777.00 |
| | | | | *Fees from Non-Defaulting Defs.* | | | | *($41,667)* |
| | | | | **Total Adj. Fee Award** | | | | $127,110.00 |

## 11. Costs

Plaintiffs also request an award of $11,066.38 in costs. The FLSA and the NYLL both permit courts to award costs to the prevailing party.[23] Generally, costs that may be recovered by a prevailing party in addition to attorney's fees include "reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998). Costs "which are part of the attorney's ordinary overhead" may not be recovered. SEC v. Goren, 272 F. Supp. 2d 202, 214 (E.D.N.Y. 2003).

---

[23] See *infra* at n. 1.

I have reviewed plaintiff's itemized report documenting costs and find them to largely be reasonable, with two exceptions. First, I find that the $3,500 cost for mediation expenses between plaintiffs and the non-defaulting defendants is not one that can be said to be subject to the joint and several liability of the Mac Hudson defendants. Second, I do not understand why plaintiffs have listed $400 in costs for registration with the EDNY ECF service as a case-related expense. As I understand it, Leeds Brown regularly litigates in this district. I hesitate to approve this cost without further documentation as to its necessity and reasonableness. The remainder of the costs are for legitimate and reasonable expenses ordinarily charged to clients: filing fees, postage, process server fees, travel to depositions, court-certified interpretation services, and the like. Accordingly, I recommend that plaintiffs be awarded $7,166.38 in costs.

## CONCLUSION

For the aforementioned reasons, I respectfully recommend that plaintiffs' motion for default judgment be granted against the Mac Hudson defendants. In terms of damages, I respectfully recommend that the non-testifying plaintiffs be denied damages at this time, without prejudice and with leave to renew their application within ninety (90) if they agree to present live testimony or show good cause why they should not be required to do so.[24]  I further recommend that the nine testifying plaintiffs be awarded a total of $613,801.90 in damages (including unpaid overtime, liquidated damages, and statutory damages for wage notice and/or wage statement violations): $78,394.54 to Washington Condor; $92,595.23 to Oscar Remache; $104,151.80 to Walter Cepeda; $27,893.90 to Fabian Saravia; $44,000 to Kareem Ransom; $34,513.43 to Ramel Towles; $22,359.54 to Freddy Alvarez; $55,264 to Luis Aguilar; and $154,629.46 to Manuel Aguilar. The following table breaks down all damages to be awarded to plaintiffs:

---

[24]  Plaintiffs' counsel is invited to contact my chambers to schedule these plaintiffs' individual testimony, either in person or by telephone, at times convenient for them. The court will make every effort to accommodate them so that they can receive the damages to which they are entitled.

| Plaintiff | OT Owed | Liq. Damages | Wage Notices | Wage Statements | Plaintiff Total |
|---|---|---|---|---|---|
| Washington Condor | $42,008.00 | $33,886.54 | n/a | $2,500.00 | $78,394.54 |
| Oscar Remache | $57,494.00 | $32,601.23 | n/a | $2,500.00 | $92,595.23 |
| Walter Cepeda | $49,575.90 | $49,575.90 | $2,500.00 | $2,500.00 | $104,151.80 |
| Fabian Saravia | $11,446.95 | $11,446.95 | $2,500.00 | $2,500.00 | $27,893.90 |
| Kareem Ransom | $19,500.00 | $19,500.00 | $2,500.00 | $2,500.00 | $44,000.00 |
| Ramel Towles | $17,628.00 | $14,385.43 | n/a | $2,500.00 | $34,513.43 |
| Freddy Alvarez | $8,906.88 | $8,452.66 | $2,500.00 | $2,500.00 | $22,359.54 |
| Luis Aguilar | $25,132.00 | $25,132.00 | $2,500.00 | $2,500.00 | $55,264.00 |
| Manuel Aguilar | $89,490.00 | $62,639.46 | n/a | $2,500.00 | $154,629.46 |
| **TOTALS** | $321,284.69 | $257,723.14 | $12,500.00 | $22,500.00 | **$613,801.90** |

In addition, I recommend that the testifying plaintiffs be awarded prejudgment interest and post-judgment interest.  Finally, I recommend that plaintiffs be awarded $127,110 in attorney's fees and $7,166.38 in costs.  Overall, I recommend a total judgment to the nine testifying plaintiffs of $748,078.28, plus prejudgment interest and post-judgment interest.  Plaintiffs' counsel is hereby directed to serve copies of this Report and Recommendation on the defaulting defendants by regular mail, and to file proof of service with the Clerk of the Court by September 14, 2018.

Any objections to this report and recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Donnelly and to my chambers within fourteen (14) days.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(d).

Respectfully submitted,

_____/s/_____

ROBERT M. LEVY
United States Magistrate Judge

Dated:  Brooklyn, New York
        September 7, 2018

47